## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*, | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| WILMINGTON TRUST, NATIONAL ASSOCIATION, as First Lien Administrative Agent and First Lien Collateral Agent, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-50441 (LSS) |
| ALTER DOMUS (US) LLC, as Second Lien Administrative Agent and Second Lien Collateral Agent, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Elizabeth A. Rogers (No. 7335)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Email:  landis@lrclaw.com
          mcguire@lrclaw.com
          erogers@lrclaw.com

**PAUL HASTINGS LLP**
Jayme T. Goldstein (admitted *pro hac vice*)
Daniel A. Fliman (admitted *pro hac vice*)
Jeremy Evans (admitted *pro hac vice*)
Isaac S. Sasson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Email:  jaymegoldstein@paulhastings.com
          danfliman@paulhastings.com
          jeremyevans@paulhastings.com
          isaacsasson@paulhastings.com

Nicholas A. Bassett (admitted *pro hac vice*)
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Email: nicholasbassett@paulhastings.com

Jason M. Pierce (admitted *pro hac vice*)
4655 Executive Drive, Suite 350
San Diego, California 92121
Telephone: (858) 458-3020
Email: jasonpierce@paulhastings.com

*Special Litigation Counsel for Wilmington Trust, National Association,*
*as First Lien Administrative Agent and First Lien Collateral Agent*

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING .......................................................... 1

SUMMARY OF ARGUMENT .................................................................................... 3

STATEMENT OF UNDISPUTED FACTS ................................................................... 3

   A.   The First Lien Credit Agreement ..................................................................... 3

   B.   The Second Lien Credit Agreement ................................................................ 5

   C.   The Intercreditor Agreement .......................................................................... 6

       a.   The Scope of "Collateral" under the Intercreditor Agreement .................. 7

       b.   Relative Priorities .................................................................................... 8

       c.   Enforcement Provisions ........................................................................... 8

       d.   Payment Waterfall and Turnover Provisions ............................................ 9

   D.   The Chapter 11 Cases .................................................................................. 11

       a.   Adequate Protection .............................................................................. 11

       b.   The Plan of Reorganization .................................................................... 12

       c.   The Administrative Claim Motion ........................................................... 14

LEGAL STANDARD ............................................................................................. 14

ARGUMENT ......................................................................................................... 15

   I.    The Intercreditor Agreement Unequivocally Prohibits the Defendant from Taking or Receiving any Distribution of Collateral, or Proceeds Thereof, in Respect of the AP Claim ................................................................................................. 17

   II.   The Unambiguous Terms of the Intercreditor Agreement Require the Defendant to Pay Over any Funds Distributed with Respect to Collateral to the First Lien Agent ....... 20

   III.  The Defendant Breached the Intercreditor Agreement by Filing the Administrative Claim Motion and Seeking Allowance of the AP Claim, Thereby Entitling the Plaintiff To Declaratory and Injunctive Relief ............................................... 23

CONCLUSION ....................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................................... 15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................................................... 15

*Greenfield v. Philles Records, Inc.*,
  780 N.E.2d 166 (N.Y. 2002)....................................................................................................... 28

*Hadley v. Gerrie*,
  124 B.R. 679 (D.V.I. 1991) ......................................................................................................... 16

*Highland Park CDO I Grantor Trust, Series A v. Wells Fargo Bank, N.A.*,
  No. 08 CIV. 5723 (NRB), 2009 WL 1834596 (S.D.N.Y. June 16, 2009).............................. 21

*In re Best Products Co., Inc.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994).......................................................................................... 16

*In re Dairy Mart Convenience Stores, Inc.*,
  351 F.3d 86 (2d Cir. 2003) .................................................................................................... 19, 25

*In re Energy Future Holdings Corp.*,
  546 B.R. 566 (Bankr. D. Del. 2016) ...................................................................................... 19, 25

*In re Erickson Retirement Communities, LLC*,
  425 B.R. 309 (Bankr. N.D. Tex. 2010)....................................................................................... 16

*In re La Paloma Generating Co. LLC*,
  609 B.R. 80 (D. Del. 2019).................................................................................................... 15, 21

*In re La Paloma Generating Co.*,
  595 B.R. 466 (Bankr. D. Del. 2018) ........................................................................................... 15

*In re Samson Resources Corp.*,
  590 B.R. 643 (Bankr. D. Del. 2018) ........................................................................................... 15

*Jackson National Life Insurance Co. v. Ladish Company, Inc.*,
  No. 92 CIV. 9358 (PKL), 1993 WL 43373 (S.D.N.Y. Feb. 18, 1993)..................................... 16

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*,
  475 U.S. 574 (1986)..................................................................................................................... 15

*Quintus Corporation v. Avaya, Inc.* (*In re Quintus Corporation*),
  353 B.R. 77 (Bankr. D. Del. 2006) ............................................................................................. 16

*Resolution Trust Corporation v. Best Products Co., Inc.* (*In re Best Products Co., Inc.*),
  177 B.R. 791 (S.D.N.Y. 1995).................................................................................................... 16

*Resolution Trust Corporation v. Best Products Co., Inc.* (*In re Best Products Co., Inc.*),
  68 F.3d 26 (2d Cir. 1995) ............................................................................................................ 16

*Santini v. Fuentes*,
  795 F.3d 410 (3d Cir. 2015) ........................................................................................................ 15

*Tamarind Resort Associates v. Government of Virgin Islands*,
  138 F.3d 107 (3d Cir. 1998) ........................................................................................................ 16

*Tsoukanelis v. Country Pure Foods, Inc.*,
    337 F. Supp. 2d 600 (D. Del. 2004)..........................................................16
*Tundo v. City of Passaic*,
    923 F.3d 283 (3d Cir. 2019) ....................................................................14

## Statutes

11 U.S.C. § 501(a) ........................................................................................27
11 U.S.C. § 503(a) ........................................................................................27
11 U.S.C. § 503(b) ........................................................................................27

## Rules

DEL. BANKR. L.R. 7007..................................................................................1
FED. R. BANKR. P. 7056 ...........................................................................1, 14
FED. R. CIV. P. 56...............................................................................1, 14, 15

Wilmington Trust, National Association, solely in its capacities as successor administrative agent and collateral agent under the First Lien Credit Agreement (as defined below) (the "**First Lien Agent**" or "**Plaintiff**"), by and through its undersigned special litigation counsel, hereby submits this memorandum of law in support of *Plaintiff's Motion for Summary Judgment* (the "**Motion**"), filed concurrently herewith, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to the above-captioned adversary proceeding (the "**Adversary Proceeding**") by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and in accordance with Rules 7007-2 and 7056-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), and in support thereof respectfully states as follows:

## NATURE AND STAGE OF THE PROCEEDING[1]

1.    The    Plaintiff    commenced    this    Adversary Proceeding    against Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement (the "**Second Lien Agent**" or "**Defendant**"), to enforce a valid and binding Intercreditor Agreement establishing the supreme rights of the Plaintiff and other First Lien Secured Parties to all distributions of, or with respect to, Collateral (as defined in the Intercreditor Agreement), and proceeds thereof. The unambiguous terms of the Intercreditor Agreement state that the First Lien Obligations must be repaid in full in cash before the Second Lien Secured Parties are allowed to receive any recoveries in respect of Collateral. Moreover, the Intercreditor Agreement provides that the Second Lien Agent cannot retain, and must turn over to the First Lien Agent, any recoveries the Second Lien Agent impermissibly receives while First Lien Obligations remain outstanding. Nonetheless, the Second Lien Agent,

---

[1]    Capitalized terms used but not defined in this section shall have the meanings assigned to them further herein.

joined by two Second Lien Lenders holding nearly all of the outstanding Second Lien Obligations, filed a motion in the Chapter 11 Cases [Main D.I. 978][2] (the "**Administrative Claim Motion**") requesting the allowance of a substantial superpriority administrative expense claim (the "**AP Claim**"). Through the Administrative Claim Motion, the Defendant seeks payment from, or with respect to, Collateral and proceeds thereof, in clear violation of the Intercreditor Agreement and in what, at best, would achieve a pyrrhic victory because all such payments on the AP Claim would need to be turned over to the First Lien Agent.

2.      To enforce the Intercreditor Agreement and vindicate its rights thereunder, on March 23, 2025, Plaintiff filed the *Adversary Complaint* [Adv. D.I. 1] (the "**Complaint**") asserting the following claims against the Defendant:

(a)      Count I seeks a declaratory judgment that the Intercreditor Agreement prohibits the Defendant from taking or receiving any Collateral or proceeds thereof on account of its asserted AP Claim unless and until the First Lien Obligations have been paid in full in cash;

(b)      Count II seeks a permanent injunction precluding the Defendant from receiving any distribution of Collateral on account of its asserted AP Claim unless and until the First Lien Obligations have been paid in full in cash;

(c)      Count III seeks a declaratory judgment that the Intercreditor Agreement mandates the Defendant to pay over any distribution it might receive on account of its asserted AP Claim to the First Lien Agent, for the benefit of the First Lien Secured Parties, unless and until the First Lien Obligations have been paid in full in cash;

(d)      Count IV seeks a permanent injunction compelling the Defendant to abide by its obligations under the Intercreditor Agreement and pay over any distribution it might receive on account of its asserted AP Claim to the First Lien Agent, for the benefit of the First Lien Secured Parties, unless and until the First Lien Obligations have been paid in full in cash;

(e)      Count V asserts a breach of contract claim against the Defendant for filing the Administrative Claim Motion in violation of the Intercreditor Agreement and

---

[2]    Unless otherwise stated, references herein to the docket of this Adversary Proceeding will be cited as "Adv. D.I. __", and references herein to the docket of the Chapter 11 Cases will be cited as "Main D.I. __".

seeks an order for specific performance of the Intercreditor Agreement compelling the Defendant to (A) refrain from (i) pursuing the Administrative Claim Motion, (ii) obtaining any payment or distribution of, or with respect to, Collateral, or any proceeds thereof, unless and until the First Lien Obligations are paid in full in cash, and/or (iii) seeking an administrative expense claim senior in priority to any administrative expense claim of the First Lien Secured Parties, and (B) pay over any distribution it might receive on account of its asserted AP Claim to the First Lien Agent, for the benefit of the First Lien Secured Parties, unless and until the First Lien Obligations have been paid in full in cash.

## SUMMARY OF ARGUMENT

3.     The Defendant filed the Administrative Claim Motion in vain because, until the First Lien Obligations have been paid in full in cash—which has not occurred and will not occur under the Debtors' plan of reorganization—the Intercreditor Agreement (a) precludes the Defendant from taking or receiving any payment of collateral (or proceeds of collateral) on account of the AP Claim asserted in the motion, (b) requires the Defendant to turn over to the Plaintiff any such payment of Collateral it may nevertheless receive on account of the claim to the First Lien Agent, and (c) prohibits the filing of the Administrative Claim Motion in the first place. The Plaintiff is entitled to relief enforcing the Intercreditor Agreement and the Second Lien Agent's specific performance thereunder. As established below, there are no genuine disputes of material fact because the controlling contractual provisions clearly and unambiguously entitle the Plaintiff to judgment as a matter of law on its claims. Accordingly, summary judgment should be granted in the Plaintiff's favor on all counts of the Complaint.

## STATEMENT OF UNDISPUTED FACTS

### A.     The First Lien Credit Agreement

4.     Pursuant to that certain First Lien Credit Agreement, dated as of March 10, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien Credit Agreement**," and together with all other agreements, guarantees, pledges,

collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the First Lien Credit Agreement) and the Intercreditor Agreement, collectively, the "**First Lien Loan Documents**"), by and among Debtors Franchise Group, Inc., Franchise Group Newco PSP, LLC, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers (the "**Borrowers**"), the guarantors party thereto (the "**Guarantors**" and, together with the Borrowers, the "**Loan Parties**"), JPMorgan Chase Bank, N.A., as initial collateral agent and administrative agent,[3] and the lenders party thereto from time to time (collectively, the "**First Lien Lenders**" and, together with the First Lien Agent, the "**First Lien Secured Parties**"), the First Lien Lenders provided a first lien secured term loan facility (the "**First Lien Facility**") to the Loan Parties in the original aggregate principal amount of $1 billion. *See Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Main D.I. 15] (the "**First Day Declaration**"), ¶¶ 54-55. In February 2023, the First Lien Facility was upsized by an incremental $300 million of aggregate principal amount of first lien term loans. *See id.* ¶ 55. As of November 3, 2024 (the "**Petition Date**"), approximately $1.097 billion on account of principal amounts was outstanding under the First Lien Facility, exclusive of any accrued and unpaid interest that was capitalized and added to the principal balance. *See id.* ¶ 56.

5.      Under the First Lien Loan Documents, each of the Loan Parties, among other things, unconditionally and irrevocably guaranteed the payment in full in cash of all principal amounts outstanding under the First Lien Facility, plus accrued but unpaid interest (including

---

[3]    The Plaintiff was subsequently appointed as successor administrative agent and collateral agent under the First Lien Credit Agreement.

default interest) thereon, plus all fees, costs, expenses, charges, disbursements, indemnification and reimbursement obligations, and all other amounts that may be due or owing under the First Lien Loan Documents (collectively, the "**First Lien Obligations**"). *See Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Main D.I. 414] (the "**Final DIP Order**"), ¶ F(b)(ii), (f). To secure the payment and performance of the First Lien Obligations, the Loan Parties also granted the First Lien Agent, for the benefit of itself and the other First Lien Secured Parties, properly perfected and continuing senior liens and security interests in substantially all assets and property of the Loan Parties. *See id.* ¶ F(b)(iii), (f).

### B.    The Second Lien Credit Agreement

6.    Contemporaneously with execution of the First Lien Credit Agreement, the Loan Parties also entered into that certain Second Lien Credit Agreement, dated as of March 20, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Second Lien Credit Agreement**," and together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Second Lien Credit Agreement) and the Intercreditor Agreement, collectively, the "**Second Lien Loan Documents**"), with the Second Lien Agent and the lenders party thereto from time to time (collectively, the "**Second Lien Lenders**," and together with the Second Lien Agent, the "**Second Lien Secured Parties**"), pursuant to which the Second Lien Lenders provided a second lien secured term loan facility (the "**Second Lien Facility**") to the Loan Parties in the original aggregate principal amount

of $300 million. *See* First Day Declaration ¶¶ 57-58. As of the Petition Date, approximately $125 million on account of principal amounts is outstanding under the Second Lien Facility, exclusive of any accrued and unpaid interest. *See id.* ¶ 59.

7.      Under the Second Lien Loan Documents, each of the Loan Parties, among other things, unconditionally and irrevocably guaranteed the payment in full in cash of all principal amounts outstanding under the Second Lien Facility, plus accrued but unpaid interest (including default interest) thereon, plus all fees, costs, expenses, charges, disbursements, indemnification and reimbursement obligations, and all other amounts that may be due or owing under the Second Lien Loan Documents (collectively, the "**Second Lien Obligations**"). *See* Final DIP Order ¶ F(c)(ii), (f). To secure the payment and performance of the Second Lien Obligations, the Loan Parties also granted the Second Lien Agent, for the benefit of itself and the other Second Lien Secured Parties, properly perfected and continuing junior liens and security interests in substantially all assets and property of the Loan Parties. *See id.* ¶ F(c)(iii), (f).

**C.    The Intercreditor Agreement**

8.      The relative rights and lien priorities of the First Lien Secured Parties and the Second Lien Secured Parties with respect to collateral securing both the First Lien Obligations and the Second Lien Obligations are governed by that certain Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"),[4] by and among the Plaintiff, as First Lien Representative (as defined in the Intercreditor Agreement) for itself and on behalf of the other First Lien Secured Parties, and the Defendant, as Second Lien

---

[4]    A true and correct copy of the Intercreditor Agreement is attached as <u>Exhibit A</u> to the *Declaration of Jason M. Pierce in Support of Plaintiff's Motion for Summary Judgment* (the "**Pierce Declaration**"), filed contemporaneously herewith.

Representative (as defined in the Intercreditor Agreement) for itself and on behalf of the other

Second Lien Secured Parties, and acknowledged by Debtor Franchise Group, Inc. on behalf of

itself and the other Loan Parties.[5]

　　　　　**a.   *The Scope of "Collateral" under the Intercreditor Agreement***

　　　　9.　　The Intercreditor Agreement governs the parties' rights with respect to the

"Collateral," broadly defined in the Intercreditor Agreement as "all of the assets and property of

any Grantor . . . in which the holders of First Lien Obligations . . . and the holders of Second Lien

Obligations . . . hold, purport to hold or are required to hold, a security interest at such time . . . ."

Pierce Decl., Ex. A § 1.1 (definition of "Collateral"). Significantly, this definition of Collateral is

not constrained to property of the Loan Parties subject to the prepetition liens granted to secure the

First Lien Obligations and the Second Lien Obligations but, rather, also encompasses "any

property subject to Liens granted pursuant to <u>Section 6</u> to secure both First Lien Obligations and

Second Lien Obligations." *Id.* Section 6 of the Intercreditor Agreement, in turn, enumerates certain

limited instances in which the Second Lien Secured Parties are permitted to seek adequate

protection in a bankruptcy proceeding involving any Loan Party. *See id.* § 6.3(b)(1)-(2).

Specifically, Section 6.3(b) provides that, if any First Lien Secured Parties are granted adequate

protection in the form of additional collateral in a Loan Party's bankruptcy proceeding, the Second

Lien Secured Parties shall be permitted to seek adequate protection in the form of a lien on such

additional collateral so long as it is subordinated to the First Lien Secured Parties' liens on such

additional collateral. *See id.* § 6.3(b)(1), (2)(A). Putting together these various provisions: the

---

[5]　　There is no genuine dispute that the Intercreditor Agreement is a binding, enforceable agreement between the Plaintiff and the Defendant. Indeed, the Intercreditor Agreement expressly recites that "[t]he Parties expressly acknowledged that this Agreement is a 'subordination agreement' under Section 510(a) of the Bankruptcy Code, which will be effective before, during and after the commencement of an Insolvency or Liquidation Proceeding." Pierce Decl., Ex. A § 6.10.

Intercreditor Agreement defines Collateral to include not only assets pledged to secure the First Lien Loans and Second Lien Loans as of the Petition Date, but also additional assets pledged as additional or replacement collateral via adequate protection liens. Thus, and as set forth further below, Collateral, as defined and used in the Intercreditor Agreement, covers all assets of the Debtors. *See infra* ¶¶ 17-20.

      **b.**   *Relative Priorities*

      10.    The Intercreditor Agreement provides that "any Lien on the Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of any Second Lien [Secured Party] . . . regardless of how acquired . . . shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations." Pierce Decl., Ex. A § 2.1(b). Section 2.1 of the Intercreditor Agreement further clarifies that this priority applies notwithstanding "any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing the First Lien Obligations." *Id.* § 2.1.

      **c.**   *Enforcement Provisions*

      11.    Consistent with the parties' intent to fully subordinate the rights of the Second Lien Secured Parties to the rights of the First Lien Secured Parties with respect to the Collateral, Section 3.1 of the Intercreditor Agreement provides that, "[u]ntil the Discharge of First Lien Obligations has occurred," meaning all First Lien Obligations have been paid in full in cash,[6] the Second Lien Secured Parties are broadly prohibited from "commenc[ing] or maintain[ing] . . . any Enforcement Action or otherwise exercis[ing] any rights or remedies with respect to the Collateral . . . ." *Id.* § 3.1(a)(1). "Enforcement Action" is defined under the Intercreditor Agreement as "any action to," among other things, "exercise [a] right or remedy, as a secured creditor or otherwise,

---

[6]   *See* Pierce Decl., Ex. A § 1,1 (definitions of "Discharge" and "Discharge of First Lien Obligations").

pertaining to the Collateral at law, in equity, or pursuant to the . . . Second Lien Loan Documents . . . ." *Id.*

12.     Furthermore, under Section 3.1(c) of the Intercreditor Agreement, the Defendant, on behalf of itself and the other Second Lien Secured Parties, expressly agreed that:

> it ***will not take or receive any Collateral or any proceeds of Collateral*** in connection with the exercise of any right or remedy with respect to any Collateral (including set-off and recoupment) in its capacity as a creditor, ***unless and until the Discharge of First Lien Obligations has occurred*** . . . . Without limiting the generality of the foregoing, ***unless and until the Discharge of First Lien Obligations has occurred,*** except as expressly provided in Sections 3.1(a) and 6.3(b) and this Section 3.1(c), ***the sole right of the Second Lien [Secured Parties] with respect to the Collateral is to hold a Lien on the Collateral*** pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein ***and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred***.

Pierce Decl., Ex. A § 3.1(c) (emphasis added).

13.     To facilitate the First Lien Secured Parties' ability to enforce this promise, Section 3.2 of the Intercreditor Agreement entitles the First Lien Secured Parties to "demand specific performance" or other equitable relief, including injunctive relief, against a Second Lien Secured Party where it, "in any way takes, attempts to or threatens to take any action with respect to the Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement), or fails to take any action required by this Agreement . . . ." *Id.* § 3.2.

### d.     *Payment Waterfall and Turnover Provisions*

14.     The Intercreditor Agreement contains payment waterfall and turnover provisions designed to ensure that the intended subordination of the Second Lien Secured Parties' rights with respect to the Collateral be faithfully honored. Section 4.1 of the Intercreditor Agreement establishes a strict waterfall governing distributions of Collateral or proceeds thereof "received in connection with any Enforcement Action or other exercise of remedies" with respect to the

Collateral. *Id.* § 4.1. Specifically, Section 4.1 of the Intercreditor Agreement provides that, after first using such Collateral or proceeds to pay reasonable out-of-pocket costs and expenses incurred in connection with any Enforcement Action or other exercise of remedies in respect of the Collateral, such proceeds shall thereafter be applied in the following order:

> SECOND, . . . to the applicable First Lien Obligations in such order as specified in the relevant First Lien Loan Documents . . . until a Discharge of First Lien Obligations . . . ; [and]
>
> THIRD, to the applicable Second Lien Obligations in such order as specified in the relevant Second Lien Loan Documents . . . .

*Id.* § 4.1.

15.    Section 4.2 of the Intercreditor Agreement enforces this payment waterfall by requiring that, "[s]o long as the Discharge of First Lien Obligations has not occurred, . . . any Collateral or any proceeds thereof . . . received by any Second Lien [Secured Party] in connection with any Enforcement Action or other exercise of any right or remedy relating to the Collateral, . . . in all cases shall be segregated and forthwith paid over to the Designated First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements . . . or as a court of competent jurisdiction may otherwise direct. Pierce Decl., Ex. A § 4.2(a). Furthermore, if in a Loan Party's bankruptcy proceeding a Second Lien Secured Party "receive[s] any distribution of money or other property in respect of the Collateral or proceeds thereof . . . such money or other property . . . shall be segregated and forthwith paid over to the Designated First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements." *Id.* § 4.2(b). These mandates are "irrevocable until the Discharge of First Lien Obligations." *Id.* § 4.2(a), (b).

16.    Finally, Section 6.3(b)(3) of the Intercreditor Agreement provides that, if any Second Lien Secured Party receives cash adequate protection payments in respect of the Collateral

in a bankruptcy proceeding involving a Loan Party "and the Discharge of First Lien Obligations does not occur upon the effectiveness of the applicable plan of reorganization," then such Second Lien Secured Party "shall pay over to the First Lien [Secured Parties] an amount . . . equal to the lesser of (i) the Second Lien Adequate Protection Payments received by such Second Lien [Secured Party] and (ii) the amount of the short-fall . . . in the Discharge of First Lien Obligations[.]" *Id.* § 6.3(b)(3).

### D. The Chapter 11 Cases

#### a. *Adequate Protection*

17.    Under the terms of the Final DIP Order, the DIP Loan Parties (as defined in the Final DIP Order) granted each of the First Lien Secured Parties and each of the Second Lien Secured Parties an adequate protection package "to the extent and in the amount of" any postpetition diminution in the value of their respective interests in the Collateral, including postpetition liens on all "DIP Collateral, which includes additional collateral not previously pledged to secure the First Lien Loans and Second Lien Loans." Final DIP Order ¶¶ 10(c)(ii), 10(e)(ii). The term "DIP Collateral" is expansively defined under the Final DIP Order to mean:

> all assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, and wherever located, including, without limitation, . . . all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), . . . and all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing . . . .

*Id.* ¶ 6(b). The interplay of the expansive definitions of both Collateral under the Intercreditor Agreement, and DIP Collateral under the Final DIP Order, make clear that all assets of the Debtors, whenever acquired, are subject to the provisions of the Intercreditor Agreement.

18.     Pursuant to the Final DIP Order, the First Lien Secured Parties and the Second Lien Secured Parties were also granted, as adequate protection, "superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code" to the extent and in the amount of any postpetition diminution in the value of their respective interests in the Collateral. *Id.* ¶¶ 10(c)(i), 10(e)(i).

19.     Consistent with the Intercreditor Agreement, the Final DIP Order further makes clear that (x) the First Lien Adequate Protection Liens are senior to the Second Lien Adequate Protection Liens, and (y) the First Lien Adequate Protection Claims are senior to the Second Lien Adequate Protection Claims (each as defined in the Final DIP Order). *See* Final DIP Order ¶¶ 10(c)(i)-(ii), 10(e)(i)-(ii), Ex. 2.

20.     Significantly, the Final DIP Order provides that the Intercreditor Agreement "(i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including, for the avoidance of doubt, with respect to the Adequate Protection Liens) and DIP Secured Parties (as if the DIP Agent was party thereto as a First Lien Term Loan Representative, in the case of the Prepetition ABL Intercreditor Agreement), and (iii) shall not be deemed amended, altered or modified by the terms of this Final Order, except to the extent expressly set forth herein." *Id.* ¶ 37.

### b.     The Plan of Reorganization

21.     The Debtors' proposed chapter 11 plan of reorganization makes clear that the "Discharge of First Lien Obligations" will not occur in these Chapter 11 Cases. The *Sixth Amended*

*Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Main D.I. 1015] (the

"**Plan**") provides:

> In full and final satisfaction, compromise, settlement, release, and
> discharge of each Prepetition First Lien Loan Claim, . . . on the
> Effective Date, each Holder of an Allowed Prepetition First Lien
> Loan Claim shall receive, subject to the terms of this Plan, payment
> of all outstanding unreimbursed fees and expenses, if any, and its
> *pro rata* share of (i) American Freight Liquidation Proceeds and
> Cash Sale Proceeds, as applicable, resulting from the sale of any
> Term Loan Priority Collateral (as defined in the Existing ABL
> Intercreditor Agreement), including as a result of any Partial Sale
> Transaction, if applicable, and (ii) 100% of the Reorganized
> Common Equity . . . .

*See* Plan § 5.4. Thus, rather than receive payment in full in cash on account of their claims relating

to the First Lien Obligations under the Plan, the First Lien Lenders will receive equity in the

Debtors as reorganized pursuant to the Plan and, potentially, a distribution of cash funded with the

"proceeds generated by the sale, lease, liquidation, or other distribution of property owned by the

American Freight Debtors" (*id.* § 1.13), and "a sale of some, all, or substantially all of the assets

or Equity Interests of the Buddy's Debtors, the Vitamin Shoppe Debtors, or a combination of the

Buddy's Debtors and the Vitamin Shoppe Debtors" (*id.* § 1.157), if any.

22.     As the Defendant has conceded, under no realistic scenario will the First Lien

Obligations be paid in full in cash under the Plan. Indeed, a fundamental premise of the

Administrative Claim Motion is that the value of the Collateral is insufficient to provide any

recovery to Second Lien Lenders, let alone fully pay the First Lien Obligations. *See* Administrative

Claim Motion ¶¶ 18-20. Moreover, the only potential sales of Collateral that may generate cash

proceeds used to make distributions to First Lien Lenders under the Plan are the contemplated

liquidation of the American Freight Debtors (as defined in the Plan) and sales of the assets or

equity interests of the Buddy's Debtors and/or the Vitamin Shoppe Debtors (each as defined in the

Plan), which indisputably will not result in sufficient cash proceeds to pay all DIP obligations, ABL obligations and First Lien Obligations in full.

### c.   The Administrative Claim Motion

23.    On February 13, 2025, the Defendant, together with certain funds and accounts advised, sub-advised, and/or managed by Pacific Investment Management Company LLC and/or its affiliates ("**PIMCO**"), and certain funds and accounts advised, sub-advised, and/or managed by Irradiant Partners, LP and/or its affiliates ("**Irradiant**" and, together with PIMCO and the Second Lien Agent, the "**Second Lien Movants**"), filed the Administrative Claim Motion, seeking entry of an order allowing the Second Lien Secured Parties a superpriority administrative expense claim in the amount of $158,383,581.40 pursuant to sections 503 and 507(b) of the Bankruptcy Code, and the Final DIP Order, for alleged postpetition diminution in the value of their interests in the collateral securing the Second Lien Obligations. *See* Administrative Claim Motion ¶¶ 15-16, 21, 23-24. Furthermore, the Administrative Claim Motion seeks allowance of an AP Claim "with 'priority over every other claim allowable under [section 507(a)] of the Bankruptcy Code[,]'" (*id.* ¶ 32), which necessarily seeks first priority payment from Collateral granted to the First Lien Secured Parties under the Final DIP Order.

## LEGAL STANDARD

24.    Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Adversary Proceeding through Bankruptcy Rule 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Tundo v. City of Passaic*, 923 F.3d 283, 286-87 (3d Cir. 2019) ("A district court properly grants summary judgment if the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting FED. R. CIV. P. 56(a))). Only a

genuine dispute as to a material fact will preclude the entry of summary judgment. "A fact is 'material' for summary judgment purposes if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

25.     The party moving for summary judgment "bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine [dispute] of material fact." *In re Samson Res. Corp.*, 590 B.R. 643, 648 (Bankr. D. Del. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant has carried its burden, the nonmoving party must then "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. PROC. 56(e) (amended 2010)). Absent such a showing, summary judgment should be granted.

## ARGUMENT

26.     The parties to the Intercreditor Agreement agreed and "acknowledge[d] that th[e] [Intercreditor] Agreement is a 'subordination agreement' under Section 510(a) of the Bankruptcy Code, which will be effective before, during and after the commencement of an Insolvency or Liquidation Proceeding." Pierce Decl., Ex. A § 6.10. Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law." 11 U.S.C. § 510(a); *accord In re La Paloma Generating Co.*, 595 B.R. 466, 470 (Bankr. D. Del. 2018), *aff'd sub nom. In re La Paloma Generating Co. LLC*, 609 B.R. 80 (D. Del. 2019). Indeed,

"subordination agreements are interpreted and enforced in accordance with general contract principles." *In re Erickson Retirement Cmtys., LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010) (citations omitted); *see also In re Best Prods. Co., Inc.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) ("The applicable non-bankruptcy law to which Section 510(a) refers is that of contracts." (citations omitted)), *aff'd sub nom. Resolution Tr. Corp. v. Best Prods. Co., Inc.* (*In re Best Prods. Co., Inc.*), 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

27.     Resolution of the claims asserted in the Complaint requires interpretation of the terms of the Intercreditor Agreement, which is governed by New York law. *See* Pierce Decl., Ex. A § 8.13. "New York law allows for the resolution on summary judgment of contract construction claims so long as the contractual language is not ambiguous." *Tsoukanelis v. Country Pure Foods, Inc.*, 337 F. Supp. 2d 600, 605 (D. Del. 2004) (citing *Jackson Nat'l Life Ins. Co. v. Ladish Co., Inc.*, No. 92 CIV. 9358 (PKL), 1993 WL 43373, at *3 (S.D.N.Y. Feb. 18, 1993)); *see also Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998) ("[I]t is a fundamental principle of contract law that 'disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment.'" (quoting *Hadley v. Gerrie*, 124 B.R. 679, 683 (D.V.I. 1991)); *Quintus Corp. v. Avaya, Inc.* (*In re Quintus Corp.*), 353 B.R. 77, 82 (Bankr. D. Del. 2006) ("Summary judgment is proper where contract language is unambiguous and favors the interpretation advanced by the movant." (citations omitted)).

28.     As demonstrated herein, the applicable provisions of the Intercreditor Agreement unambiguously (i) prohibit the Defendant from receiving any payment of Collateral or proceeds thereof on account of its asserted AP Claim before the First Lien Obligations have been paid in full in cash, (ii) require that any payment or distribution of, or with respect to, Collateral or

proceeds thereof that the Defendant were to receive on account of the AP Claim be paid over to the First Lien Agent until the First Lien Obligations have been paid in full in cash, and (iii) forbid the Defendant from pursuing any Enforcement Action in the Chapter 11 Cases inconsistent with the foregoing, which the Defendant disregarded by filing the Administrative Claim Motion. No genuine dispute of material fact exists as to any of these issues. Accordingly, Plaintiff is entitled to summary judgment on all counts of the Complaint.

I.    **THE INTERCREDITOR AGREEMENT UNEQUIVOCALLY PROHIBITS THE DEFENDANT FROM TAKING OR RECEIVING ANY DISTRIBUTION OF COLLATERAL, OR PROCEEDS THEREOF, IN RESPECT OF THE AP CLAIM**

29.    The Intercreditor Agreement evidences the parties' intent to enter into the functional equivalent of an agreement for payment subordination. The Intercreditor Agreement provides that the liens securing the Second Lien Obligations are expressly "junior and subordinate in all respects" to all liens securing the First Lien Obligations, which liens "shall be and remain senior in all respects and prior to" the liens securing the Second Lien Obligations, irrespective of "any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing the First Lien Obligations." Pierce Decl., Ex. A § 2.1(b). Moreover, the Intercreditor Agreement ensures that the First Lien Secured Parties' interests remain senior to those of the Second Lien Secured Parties with respect to Collateral for so long as the Discharge of the First Lien Obligations has not occurred, including in any bankruptcy proceeding commenced by or against any Loan Party. *See id.* § 3.1(c).

30.    Specifically, the expansive definition of Collateral under the Intercreditor Agreement extends to all assets and property of any Loan Party in which the First Lien Secured Parties and the Second Lien Secured Parties "hold, purport to hold or are required to hold, a securing interest at such time" (*id.* § 1.1 (definition of "Collateral"), including the additional collateral in which the First Lien Secured Parties and Second Lien Secured Parties were granted a

17

lien as part of the adequate protection afforded to them under the Final DIP Order. That additional collateral, which is coextensive with the DIP Collateral (as defined under the Final DIP Order), includes "all assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties" (Final DIP Order ¶ 6(b)).

31.     Consistent with this priority scheme, under Section 3.1(c) of the Intercreditor Agreement, the Defendant, on behalf of itself and each other Second Lien Secured Party, agreed "***it will not take or receive any Collateral or any proceeds of Collateral*** in connection with the exercise of any right or remedy with respect to any Collateral (including set-off and recoupment) in its capacity as a creditor, ***unless and until the Discharge of First Lien Obligations [i.e., payment in full in cash] has occurred*** . . . ." Pierce Decl., Ex. A § 3.1(c) (emphasis added).

32.     In this case, it is undisputed that the First Lien Obligations have not been and will not be paid in full in cash.

33.     At the same time, any funds that could ever be used by the Debtors to pay the AP Claim, if it is allowed, would necessarily be Collateral or proceeds thereof. That is because, put simply, all cash the Debtors now have—or may hereafter acquire—through the Effective Date is, by definition, Collateral. *See* Final DIP Order ¶ 6(b) (including "all assets and properties . . . whether now owned . . . or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties"); Pierce Decl., Ex. A §§ 1.1 (definition of "Collateral"), 6.3(b). Or said another way: it is impossible for the Debtors to repay the AP Claim with funds that are not Collateral, because no such funds could ever exist, as any cash obtained by the Debtors will automatically become DIP Collateral, and by extension, Collateral under the Intercreditor Agreement.

34.    Likewise, the Administrative Claim Motion, which seeks payment on account of purported diminution in value of the Second Lien Movant's interest in their collateral, is indisputably an "exercise of any right or remedy with respect to any Collateral[.]" Pierce Decl., Ex. A § 3.1(c). The Administrative Claim Motion seeks the allowance of the AP Claim, which constitutes an exercise of the Second Lien Agent's rights or remedies with respect to Collateral, because the basis for asserting the AP Claim is wholly dependent on the Second Lien Agent's status as a secured creditor (and any resulting diminution in value of its interest in the Collateral). *See, e.g.*, *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90 (2d Cir. 2003) ("The adequate protection provision of 11 U.S.C. § 361 protects only secured creditors." (citations omitted)); *In re Energy Future Holdings Corp.*, 546 B.R. 566, 581 (Bankr. D. Del. 2016) ("[A]dequate protection is designed to protect *secured* creditors against diminution in value of their collateral.") (emphasis added); *In re Chama, Inc.,* 265 B.R. 662, 669 (Bankr. D. Del. 2000) (holding that if a creditor's security interest is avoided, and it becomes an unsecured creditor, "[i]t is . . . not entitled to any adequate protection" (citations omitted)); *see also* infra ¶ 48.

35.    Accordingly, Section 3.1(c) of the Intercreditor Agreement clearly forecloses the Defendant from receiving a distribution on account of any allowed AP Claim.

36.    Plaintiff is therefore entitled to summary judgment on Counts I and II of the Complaint, which seek (i) a declaratory judgment that the Intercreditor Agreement prohibits the Defendant from receiving any distribution of, or with respect to, Collateral or proceeds thereof on account of its asserted AP Claim, and (ii) a permanent injunction preventing the Defendant from receiving any distribution of, or with respect to, Collateral, or proceeds thereof, unless and until the First Lien Obligations are paid in full in cash.

## II.   THE UNAMBIGUOUS TERMS OF THE INTERCREDITOR AGREEMENT REQUIRE THE DEFENDANT TO PAY OVER ANY FUNDS DISTRIBUTED WITH RESPECT TO COLLATERAL TO THE FIRST LIEN AGENT

37.    In addition, the Intercreditor Agreement provides that, to the extent the Second Lien Secured Parties receive any distribution of, or with respect to, Collateral, or proceeds thereof, including as a result of their AP Claim, they must turn over such amounts to the First Lien Secured Parties consistent with the agreement's waterfall provisions and unless and until the First Lien Obligations have been paid in full in cash.

38.    Specifically, the payment waterfall established in Section 4.1 of the Intercreditor Agreement provides that "any Collateral or any proceeds thereof . . . received in connection with any Enforcement Action or other exercise of remedies . . . with respect to the Collateral" must be applied to the First Lien Obligation until the Discharge of First Lien Obligations before the Second Lien Secured Parties are allowed to receive any recovery on account of the Second Lien Obligations from Collateral or "proceeds thereof." Pierce Decl., Ex. A § 4.1. The turnover provision of Section 4.2 assures this distribution scheme will be respected insofar as it requires any distribution of, or in respect of, Collateral, or proceeds thereof, received by the Second Lien Secured Parties, prior to the Discharge of First Lien Obligations, to be paid over to the First Lien Agent for the benefit of the First Lien Secured Parties. Pierce Decl., Ex. A § 4.2.

39.    In that same vein, Section 6.3(b)(3) of the Intercreditor Agreement further provides:

> If any Second Lien Claimholder receives Post-Petition Interest and/or cash adequate protection payments in respect of the Collateral in an Insolvency or Liquidation Proceeding . . . and the Discharge of First Lien Obligations does not occur upon the effectiveness of the plan of reorganization for, or conclusion of, that Insolvency or Liquidation Proceeding, then each Second Lien Claimholder shall pay over to the First Lien Claimholders an amount . . . equal to the lesser of (i) the Second Lien Adequate Protection Payments received by such Second Lien Claimholder and (ii) the

> amount of the short-fall ... in the Discharge of First Lien Obligations . . . .

Pierce Decl., Ex. A § 6.3(b)(3).

40.     The combined effect of these provisions is to make clear that the Second Lien Obligations are junior and subordinate to the First Lien Obligations in all respects, including priority of payment in respect of Collateral or proceeds thereof, for so long as any First Lien Obligations have not been paid in full in cash. *See In re La Paloma Generating Co. LLC*, 609 B.R. at 100 (affirming the bankruptcy court's ruling that the terms of an intercreditor agreement amounted to the "functional equivalent of payment subordination" such that the parties intended for the first lien lender to be paid in full before the second lien lenders would be permitted to receive any recovery); *cf. Highland Park CDO I Grantor Tr., Series A v. Wells Fargo Bank, N.A.*, No. 08 CIV. 5723 (NRB), 2009 WL 1834596, at *3 (S.D.N.Y. June 16, 2009) ("The section [of an intercreditor agreement] titled 'Payment Subordination' states that in the event of a default on the senior loan (which the parties do not contest has occurred here), 'Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan.' Indeed, the agreement further provides that in the event Highland receives any payment on the mezzanine loan before the senior loan is paid in full, Highland must place that payment in trust and pay it over to Wells Fargo to satisfy the senior loan. These contractual provisions are obviously designed to ensure that the senior loan is paid in full before Highland is permitted to keep any money received in repayment of the mezzanine loan.").

41.     As discussed above, the Defendant cannot genuinely dispute that the First Lien Obligations remain outstanding and will not be fully repaid in cash under the Plan. In such a circumstance, the Intercreditor Agreement provides at least three different mechanisms by which

any payment on the AP Claim (there should be none) would be required to be paid over to the Plaintiff pursuant to the Intercreditor Agreement.

42.     *First*, because Collateral under the Intercreditor Agreement includes DIP Collateral—which includes all cash, assets, or property of the Debtors, including property "hereafter acquired," that could fund a payment on the AP Claim on the plan Effective Date—any AP Claim recovery can only be funded by Collateral, or proceeds thereof. *See supra* ¶¶ 9, 17. And because any payment on account of the AP Claim would be a payment received in connection with an Enforcement Action or exercise of right or remedy relating to the Collateral (*see supra* ¶ 34, *infra* ¶48), any payment on account of the AP Claim would be required to be paid over to the Plaintiff unless and until the First Lien Obligations are paid in full in cash. *See* Pierce Decl., Ex. A § 4.2(a) (providing that "any Collateral or any proceeds thereof . . . received . . . in connection with any Enforcement Action or other exercise of any right or remedy relating to the Collateral . . . shall be segregated and forthwith paid over to the Designated First Lien Collateral Agent for the benefit of the First Lien Claimholders.").

43.     *Second*, even if an AP Claim recovery could somehow be funded by assets that were not considered Collateral, or proceeds thereof, under the Intercreditor Agreement (an impossibility given that Collateral as defined in the Intercreditor Agreement includes ***all*** assets of the Debtors, whenever acquired), such a purported payment would ***still be required to be paid over*** to the Plaintiff, pursuant to Section 4.2(b) of the Intercreditor Agreement, because, inasmuch as payment of a diminution-in-value claim is dependent on a creditor's interest in its collateral (*see supra* ¶ 33), such a payment would necessarily be a "distribution of money or other property ***in respect of*** the Collateral or proceeds thereof," and thus, "such money or other property" would

likewise need to be "forthwith paid over" to Plaintiff. *See* Pierce Decl., Ex. A § 4.2(b) (emphasis added).

44.     *Third*, even if payment on account of the AP Claim was somehow not covered by the turnover provisions in Section 4.2(a) or Section 4.2(b) of the Intercreditor Agreement, it would **still** need to be turned over to Plaintiff pursuant to Section 6.3(b)(3) of the Intercreditor Agreement, which further addresses the exact scenario we find ourselves in here and provides that, "[i]f any Second Lien Claimholders receives . . . cash adequate protection payments in respect of the Collateral", unless and until the First Lien Obligations have been paid in full in cash, such adequate protection payments shall be paid over to Plaintiff. *See id.* § 6.3(b)(3). There can be no dispute that payment on the AP Claim—which, Plaintiff has argued would need to be paid in full, in cash, pursuant to section 1129(a)(9) of the Bankruptcy Code (*see* Administrative Claim Motion ¶ 32)— would be a "cash adequate protection payment," thus triggering Section 6.3(b)(3)'s separate and additional turnover provision.

45.     Accordingly, summary judgment should be granted to the Plaintiff on Counts III and IV of the Complaint, which seek (i) a declaratory judgment that the Intercreditor Agreement requires the Defendant to pay over any distribution of, or with respect to, Collateral, or proceeds thereof, it receives on account of its asserted AP Claim to the First Lien Agent, unless and until the First Lien Obligations are paid in full in cash, and (ii) a permanent injunction compelling the Defendant to so pay over any such amounts to the First Lien Agent.

**III.    THE DEFENDANT BREACHED THE INTERCREDITOR AGREEMENT BY FILING THE ADMINISTRATIVE CLAIM MOTION AND SEEKING ALLOWANCE OF THE AP CLAIM, THEREBY ENTITLING THE PLAINTIFF TO DECLARATORY AND INJUNCTIVE RELIEF**

46.     Under Section 3.1 of the Intercreditor Agreement, the Second Lien Secured Parties agreed to be "silent seconds" and, subject to limited exceptions, "not commence or maintain, or

seek to commence or maintain, any Enforcement Action or otherwise exercise any rights or remedies with respect to the Collateral" until the First Lien Obligations have been paid in full in cash. Pierce Decl., Ex. A § 3.1(a). The definition of "Enforcement Action" under the Intercreditor Agreement means "any action to," among other things, "collect on, take possession or control of . . . or otherwise exercise or enforce remedial rights with respect to Collateral," "receive a transfer of Collateral in satisfaction of Indebtedness or any other Obligation secured thereby, or "exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Collateral at law, in equity, or pursuant to the . . . Second Lien Loan Documents . . . ." *Id.* § 1.1 (definition of "Enforcement Action"). The Second Lien Secured Parties also agreed that, until the First Lien Obligations have been paid in full in cash, the First Lien Secured Parties "shall have the exclusive right to commence and maintain an Enforcement Action or otherwise enforce rights and exercise remedies with respect to the Collateral," subject to the Second Lien Agent's right to credit bid in connection with a bankruptcy sale of the Collateral so long as the cash component of such bid is otherwise sufficient to fully repay the First Lien Obligations in cash. *Id.* § 3.1(b), (c)(6).

47.     Additional provisions of the Intercreditor Agreement further substantiate the parties' intent to broadly subordinate the Second Lien Secured Parties' rights in respect of the Collateral to those of the First Lien Secured Parties for so long as any First Lien Obligations remain outstanding. For example, in Section 3.1(c) of the Intercreditor Agreement, the Defendant—on behalf of itself and each of the other Second Lien Secured Parties—agreed that, "unless and until the Discharge of First Lien Obligations has occurred," subject to the limited exceptions "provided in Sections 3.1(a) and 6.3(b) and this Section 3.1(c), *the sole right of the [Second Lien Secured Parties] with respect to the Collateral is to hold a Lien on the Collateral* pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein *and to receive a share*

*of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred*." *Id.* § 3.1(c) (emphasis added). In Section 3.1(d), the Defendant also agreed that "***it will not take any action that would hinder any exercise of remedies under the First Lien Loan Documents or is otherwise prohibited [under the Intercreditor Agreement]***, including any . . . transfer or other disposition that is prohibited [t]hereunder . . . ." *Id.* § 3.1(d)(1) (emphasis added).

48.    The filing of the Administrative Claim Motion unquestionably constitutes the commencement of an Enforcement Action because it seeks to "exercise a[] right or remedy, as a secured creditor or otherwise, pertaining to the Collateral" (Pierce Decl., Ex. A § 1.1 (definition of "Enforcement Action"), for the reasons discussed above. Additionally, the Administrative Claim Motion seeks the allowance of the AP Claim, which constitutes an exercise of the Defendant's rights or remedies with respect to Collateral because the Defendant's basis for asserting the AP Claim is wholly dependent on its status as a secured creditor because the right to adequate protection only inures to secured creditors. *See, e.g.*, *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d at 90 ("The adequate protection provision of 11 U.S.C. § 361 protects only secured creditors." (citations omitted)); *In re Energy Future Holdings Corp.*, 546 B.R. at 581 ("[A]dequate protection is designed to protect *secured* creditors against diminution in value of their collateral.") (emphasis added).

49.    Although the Intercreditor Agreement expressly permits the Defendant to take certain limited enforcement-related actions in connection with the Chapter 11 Cases,[7] none of those exceptions to the general prohibition on Enforcement Actions permits the filing of the Administrative Claim Motion. Section 3.1(c) of the Intercreditor Agreement carves out eight

---

[7]    *See* Pierce Decl., Ex. A § 3.1(c) ("[E]xcept as expressly provided in Sections 3.1(a) and 6.3(b) and this Section 3.1(c), the sole right of the [Second Lien Secured Parties] with respect to the Collateral is to hold a Lien on the Collateral . . . .").

permitted actions that the Second Lien Secured Parties may take in exercising remedies with respect to the Collateral, only one of which permits the filing of motions in a bankruptcy case. Specifically, Section 3.1(c)(4) provides, in relevant part that, "[n]otwithstanding the foregoing, any [Second Lien Secured Party] may:"

> vote on any plan of reorganization, arrangement, compromise or liquidation, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Lien Obligations and the Collateral; <u>provided</u> that no filing of any claim or vote, or pleading related to such claim or vote, to accept or reject a disclosure statement, plan of reorganization, arrangement, compromise or liquidation, or any other document, agreement or proposal similar to the foregoing by any Second Lien Representative, any Second Lien Collateral Agent or any other Second Lien Claimholder may be inconsistent with the provisions of this Agreement; . . . .

Pierce Decl., Ex. A § 3.1(c)(4).

50.    Significantly, although this provision permits the filing of "motions" in a bankruptcy case, such actions still must be "in accordance with the terms of th[e] [Intercreditor] Agreement . . . ." *Id.* The Administrative Claim Motion is not such an action taken "in accordance with the terms of th[e] [Intercreditor] Agreement" because it constitutes an attempt by the Second Lien Movants to take or receive Collateral or proceeds thereof prior to the full cash repayment of the First Lien Obligations, which, as discussed *supra* Section I, is prohibited under the last paragraph of Section 3.1(c) of the Intercreditor Agreement.

51.    Neither does Section 3.1(c)(1), which authorizes the "fil[ing] [of] a claim or statement of interest with respect to the Second Lien Obligations" (*id.* § 3.1(c)(1)), permit the filing of the Administrative Claim Motion. The Administrative Claim Motion is, on its face, a motion, not a claim. which, given its plain meaning, should be interpreted as authorizing the filing of a proof of claim. Section 3.1(c)(1) refers to the filing of a "claim" or "interest," which tracks the

language of section 501(a) of the Bankruptcy Code governing the submission of prepetition claims. *See* 11 U.S.C. § 501(a) ("A creditor or an indenture trustee may file a proof of claim. An equity security holder may file a proof of interest."). By contrast, the Administrative Claim Motion is a motion that seeks relief pursuant to section 503 of the Bankruptcy Code, which requires a claimant seeking allowance of an administrative expense to "timely file a request for payment" to be considered "[a]fter notice and a hearing." *Id.* § 503(a), (b). Thus, the Administrative Claim Motion is not authorized by Section 3.1(c)(1) of the Intercreditor Agreement.

52.     Finally, Section 6.3(b)(2) of the Intercreditor Agreement permits the Second Lien Secured Parties "to seek adequate protection with respect to their rights in the Collateral in any Insolvency or Liquidation Proceeding," including in the form of "an administrative expense claim in respect of the Collateral; provided that as adequate protection for the First Lien Obligations, each First Lien Representative, on behalf of the First Lien Claimholders represented by it, is also granted an administrative expense claim in respect of the Collateral which is senior and prior to the administrative expense claim of the Second Lien Representatives and the other Second Lien Claimholders . . . ." Pierce Decl., Ex. A § 6.3(b)(2)(C). This exception also does not permit the filing of the Administrative Claim Motion because the Second Lien Secured Parties are not seeking adequate protection therein. Adequate protection was already granted in the Final DIP Order as a condition to the Debtors' use of cash collateral and obtaining priming financing. What the Second Lien Secured Parties seek in the Administrative Claim Motion is the separate allowance and ultimately payment of an administrative expense claim, on account of purported diminution in value. That is not seeking adequate protection and falls outside this exception.

53.     Accordingly, the Administrative Claim Motion constitutes an Enforcement Action that the Defendant was prohibited from bringing under the Intercreditor Agreement, and the

Defendant's decision to nevertheless file the Administrative Claim Motion breached the Intercreditor Agreement.

54.     Additionally, under Section 3.2 of the Intercreditor Agreement, the Defendant clearly and unambiguously agreed that the Plaintiff may demand specific performance of the Intercreditor Agreement to remedy any breaches of the agreement by a Second Lien Secured Party. *See id.* § 3.2. Where, as here, a contract is "complete, clear and unambiguous on its face," the court must enforce the agreement "according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citations omitted). Accordingly, the Plaintiff is also entitled to an order for specific performance compelling the Defendant to withdraw the Administrative Claim Motion and cease further prosecution of the AP Claim. As a result, the Plaintiff is entitled to specific performance of the Intercreditor Agreement.

55.     Summary judgment should therefore be granted to Plaintiff on its breach of contract and specific performance claim alleged in Count V of the Complaint.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court enter an order, substantially in the form attached to the Motion as Exhibit A, (i) granting summary judgment on all counts of the Complaint in favor of the Plaintiff, and (ii) granting such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 1, 2025
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Elizabeth A. Rogers (No. 7335)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      erogers@lrclaw.com

-and-

**PAUL HASTINGS LLP**

Jayme T. Goldstein (admitted *pro hac vice*)
Daniel A. Fliman (admitted *pro hac vice*)
Jeremy Evans (admitted *pro hac vice*)
Isaac S. Sasson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: jaymegoldstein@paulhastings.com
      danfliman@paulhastings.com
      jeremyevans@paulhastings.com
      isaacsasson@paulhastings.com

Nicholas A. Bassett (admitted *pro hac vice*)
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705
Email: nicholasbassett@paulhastings.com

*Special Litigation Counsel for Wilmington Trust,*
*National Association, as First Lien Administrative*
*Agent and First Lien Collateral Agent*